Council. Mr. Wu, are you here? Yes, I am present. Mr. Fine? Yes, I am here as well. Mr. Phan? Yes, I am here for the Appalachian respondents. Okay, so Mr. Wu, you're going to go first, I understand? Yes, that's right. And you've got five minutes, but you've reserved a minute for rebuttal. So at the three-minute mark, Ms. Rodriguez will give you a warning that you've got a minute left. That'll be your yellow light, okay? Wait, I think I might have five minutes. Oh, wait, no, I'm sorry. Wait, five minutes and one minute rebuttal, right, sorry. I misspoke. It's 12 minutes total, five minutes up front, one minute of rebuttal. You'll get a warning at the four-minute mark. Thanks. Sorry for the mess. No problem. You may have pleased the Court. Stephen Wu for the state petitioners. I intend to address the statutory arguments in this case, and my friend Ian Fine from NRDC will address the arbitrary and capricious claim. In the interest of time, we will rely on the arguments in our briefs about NEPA unless this Court has any questions. I have two statutory arguments here. The first is that the Improvement Act, like its predecessors, applies to the CAFE civil penalty, and the second is that the Act precludes NEPA from now invoking the negative economic impact exception. The CAFE penalty satisfies the longstanding definition of a civil monetary penalty in the Improvement Act because it is for a specific monetary amount. Namely, it is set at a specific dollar figure of $5.50 per increment of noncompliance, and that figure also represents the maximum amount of the penalty for each such increment. This use of a specific dollar figure makes the CAFE penalty fit exactly with what Congress intended to address in the Improvement Act and its predecessors, which was to identify federal civil penalties that would be eroded by inflation because they use specific nominal dollar figures. I mean the uncontroversial economic point underlying Congress's policy is that $5.50 today is worth much less in real terms than $5.50 in 1996. And as a result, the CAFE penalty… This is Chuck Park. If an automaker missed CAFE standards in a year but had enough credit to offset the amount that was calculated, then the penalty would be zero, right? That's correct, Your Honor, but that doesn't change the applicability of the statute here because under this scheme, the credits are a way of complying with the underlying statute. And this is clearest from Section 32911 of APCA. But it matters for the statutory interpretation point because we wouldn't say that the penalty is still $5.50. That's incorrect, Your Honor. I mean because the credits factor into the determination of whether a manufacturer has complied with the statute, the $5.50 is still being applied to whatever increment of noncompliance remained after factoring in the credits. And again, 32911 says explicitly, and I quote, compliance is determined after considering credits. A manufacturer that has enough credits that are earned from overcompliance with the CAFE standards to cover any shortfall from its fleet in a particular model year is complying with the statute. It has not committed a violation that warrants civil penalties. And if it has credits that make up part of that, then the remaining sort of delta is the relevant violation for purposes of the penalty. Judge Nardini, can I follow up more specifically with you on that? We're dealing with a question of statutory construction here, right? That's correct. And it seems that for purposes of 32912, we're looking at subsection B, which defines the civil penalty, right? That's right. And so I'm struggling here with how section B defines the civil penalty. And it seems, as I read it, that you have two alternative readings. One, it says a civil penalty of $5. And then there's language that follows after that. Multiplied by each tenth of a mile per gallon. And then there's paragraphs one, two, and three that make various specifications. So you could either read it as saying the civil penalty is $5, period. Or the civil penalty is of $5 multiplied by the tenth of a mile calculated under the section multiplied by the number of automobiles and reduced by the credits, right? So I could see two arguments. You're either saying a civil penalty of $5, and then all the rest is not a definition of the penalty. Or you have to take all the rest, meaning all the multipliers, and the reduction of the credits as all part of the definition of the penalty. Would you agree with that, that it's either one or the other? Or do you think that there's some halfway interpretation that we could choose between where you're only, say, taking the $5 and one of the multipliers? Because that's kind of what it sounded like you were talking about with the credits, that you could define the penalty as the $5 with the mileage multiplier, with the number of automobile multiplier, but not taking subsection three. Are you making that argument or no? No. So our argument is that, for purposes of the Improvement Act, the relevant figure is the $5 figure. That is the specific monetary amount under the Act. Period. And the rest of it is not the penalty. Well, that's the amount under the Act that Congress wanted to address here. No, no, no. But focus on the word penalty. What's your penalty? $5 or $5.50? Whatever it is. Is that your argument? I think it doesn't matter here for a couple of reasons. One is that hundreds of federal civil penalties are expressed as a formula in this way. They use a dollar figure and apply it by some measure of the regulated entity's noncompliance with the statute. And I apologize. I'm going to interrupt you. And please do come back to this point. But I just want to know the argument that you're about to make about what doesn't matter. It does matter to know what you believe the civil, quote, penalty is, right? So are you arguing it's the $5 or $5.50 is the penalty? And now you're going to explain why the rest doesn't matter? Just start with your definition of the penalty. Sure. So the direct answer is that it's both, right? The way that the statute defines the penalty is by an incremental measure. It says it's $5 and later increased to $5.50 per increment of noncompliance as measured by the statute. And if you aggregate it all together across the measure of noncompliance of the manufacturer, then you get an overall figure that is also the penalty. So there's two overalls then. One is just $5. That's one of your versions of the penalty. And you're saying that it simultaneously also means another thing. And I guess I'm, again, looking at 32-912. You're saying it's the prefatory language of B plus subsections B-1 and B-2 but not including B-3? Right. And B-3 is distinct because of the way under the statute compliance is measured. I mean, every civil penalty scheme works first by measuring compliance or noncompliance and then multiplying it by some penalty rate. And, again, the way that this statute defines compliance under 32-911 is to say compliance is determined after considering credit. Any resulting sort of violation by the manufacturer, whether because their own fleet falls below the standard or because they don't have credits to make up for the shortfall, then gets multiplied by the straightforward formula by the dollar figure that is eroded by inflation. I guess what I'm wondering is then how do you say that the penalty formula only includes part of paragraph B? I don't understand linguistically, textually, why is B-1 and B-2 all factored into the formula that, in your view, constitutes the penalty? But linguistically, for a civil penalty of, you keep reading through paragraphs 1 and 2, but you stop reading before you get to paragraph 3, even though there's a semicolon in the word and. Because this provision has to be read in conjunction with both 32-911 and the statutory provision on the credit scheme in the understanding of how credits factor into the system, which is, again, as a method of compliance with the statute. And mathematically, it works out the same either way. You're reducing the amount of the violation either ahead of time or you're reducing the amount of the penalty afterwards. It amounts mathematically to the same thing at the end of the day. Isn't that just a way of saying Congress could have written this any number of ways and reached the same economic results? But our problem is that we're dealing with the construction of a text, and we're supposed to look at the Improvements Act, look at the definition of a specific monetary penalty, and we need to plug something into that. What is this specific monetary penalty? And I understand the economics. But my question is, are you – you seem to be arguing that it's either or both the $5 alone and then the $5 of B-1 and 2 but not B-3. Well, under the Improvements Act, the specific monetary amount that has to be adjusted is the $5. That, I think, is a straightforward answer under that statute. And the reason I was saying before that it is, in a sense, immaterial how you decide what civil penalty covers under EPCA is that statutes across the federal government use civil penalties in exactly this way. The dollar figure multiplied by some measure of noncompliance. And for three decades, the way that the federal agencies have applied the Improvements Act and its predecessors to those penalties is to increase the underlying dollar figure. And the reason that makes sense under the Improvements Act and why Congress defines civil monetary penalty in this way is they were trying to target dollar figures that would be eroded by inflation. The fact that there is a multiplier by some increment of noncompliance afterwards, that isn't the thing that is affected by inflation. What is affected is the dollar figure that is expressed in nominal rather than real terms and, therefore, means much less 30 years later than it did when Congress enacted it in the first instance. And that is also why— Sorry, this is Judge Park. To the extent that there's multiple ways of reading this provision to identify what the penalty is and, I guess, on top of that, to the extent that there's something unique about applying the credits here is different from the kind of the multiplier part of the formula. Aren't those ambiguities to which we should refer to defer to NHTSA's interpretation of how to apply the statute? They are not because there is no relevant ambiguity under the Improvements Act, which is the applicable statute. And this court has already held that NHTSA doesn't get that. I thought your answers to Judge Nardini's questions were sort of admitted ambiguity in terms of what the penalty precisely is. It's one or the other, sometimes one or it's immaterial. But not a relevant ambiguity under the act. Again, the purpose of the act was to identify the use of these specific monetary amounts in ways that inflation would necessarily erode over time. And here, this statute, like hundreds of other civil penalties, uses a dollar figure in precisely that way. And what NHTSA was required to do and had no discretion or delegated interpretive authority to deviate from was to take that dollar figure and update it for cost of living adjustments under a formula that Congress imposed. And again, hundreds of statutes have been modified in precisely this way. There's a formula with some sort of base dollar figure that's eroded by inflation, and the agencies have adjusted it upward to keep up with Congress's original intent in enacting the penalty in the first instance. Can I ask you about that? I'm sorry, Judge Nardini. And I know that some of the parties or some of the briefs tried to make reference to other penalty provisions and other statutes that they viewed as analogous. And I understand your argument about the multiplier. If you had – I think there was one about the Coast Guard having a regulation that you pay X amount per ton of a ship. So I understand if 32,912 only contained B1 and 2, where all you had was a base dollar amount and two fixed multipliers. But then you have this third variable about the credit. Can you point us to another statute where the calculation of the penalty itself includes a calculation like this credit? Well, again, the way – Meaning not a fixed number. So not in precisely this way, but this is where I go back to the point that the credits here are meant to be a way for providers – for manufacturers, excuse me, to comply with the statute. And in that respect, there are many comparisons in the federal statute. The IPI amicus brief identifies other environmental statutes, such as the scheme for cross-state air pollution. It uses credits where a particular emitter can purchase credits on the market to come into compliance with the statute, even if their own emissions standing alone would not have them satisfy the relevant regulatory or statutory standards. And that is the way – Let's talk about that one because that's a helpful comparison, I think, or maybe it is or maybe it isn't. I looked at that, and that very clearly talked about the credits, as you say, to be used in determining whether there's a violation. But then if you look at the penalties, it's simply an on-off switch, right? If you have a violation, then you are liable for – I can't remember. It's like $5,000 for each violation. There is no penalty provision that I saw comparable to 32-912 that in the penalty provision would then allow you to offset credits against the penalty. So I understand if you had a statute that only factored credits into the violation finding. But here you could have a violation, and it modulates – it's in the statutory section dealing with the penalty. So do you have a statute where credits are factored into the penalty? So I do not, but I have two responses to that. One is that although this is the way it is calculated under EPCA, I mean, again, the credits are a feature of compliance. They are not deemed to be – and again, this is clear from 32-911, which says compliance is determined after considering the credits here. And so operationally, they work in the same way as under the cross-state air pollution rule. But the second point is even if you do think that the credits here are in some sense offsetting the penalty, the $5 amount that is set out in the statute, this sort of nominal dollar figure, at minimum taxed the amount of liability for the penalty for a manufacturer. So it's a maximum amount under the statute. All that credits can do is to reduce that penalty amount to less than that maximum. And it's unambiguous in the Improvement Act that maximum amounts are also governed by the inflation adjustment and have to be increased. Again, even if it is true that a manufacturer may not end up paying that maximum amount. And NIFA has agreed as much. Under subsection A, they agree the general penalty, which is a maximum amount expressed as a formula, has to be adjusted upwards. But another point that I want to make here is to say that this is not a new question. I mean, there have been three decades of the application of the definition of the 1990 Inflation Adjustment Act to federal civil penalties across the board, including the CAFE penalty. And the understanding has been unbroken and uniform for those three decades that not just dollar figures like this one, but the CAFE penalty specifically is covered by this definition. In fact, the $5.50 rate, the $5.50 amount that NIFA seeks to reinstate here was itself the result of an inflation adjustment mandated by the 1996 amendments to the statute, which applied the same definition of civil monetary penalty for the same purpose and capped it at a 10% amount. And again, NIFA is agreeing with this increase in the penalty amount under the 1996 amendment under the same definition, and that was the background understanding that Congress was legislating against here. All right. Well, we're way over. You have one other different point you want to make? Very quickly, just to summarize our argument about negative economic impact. If the statute applies here, it is undisputed that the negative economic impact exception applies only to the initial catch-up adjustment. And this court previously held that that catch-up adjustment had to be completed by the statutory deadline, which in fact took place, and NIFA did not have authority to adjust that deadline or to modify that penalty after the fact. And that conclusion applies as well to the exception. Thank you. All right. Thank you. Well, you've reserved a minute for rebuttal. Mr. Fine will now hear from you for five minutes. Thanks, Your Honor. I would like to address why the repeal rule was arbitrary and capricious, because the agency unreasonably refused to consider the many positive economic impacts of an updated penalty. But I do first want to just point out one other thing in the colloquy you were having with Mr. Wu, which is that I think it's important to take a step back and look at the definition of civil monetary penalty under the Inflation Adjustment Act. It does not define a civil monetary penalty as one that is a specific monetary amount, but rather one that is for a specific monetary amount or has a maximum amount. And the CAFE penalty satisfies both of those prongs. Even if you include the credit provision of 32912B3 within the concept of what the CAFE penalty is, the penalty is still for a specific amount of $5 per tenth of a mile per gallon per increment of noncompliance. And all the credits do, they're just like those other credit provisions that are referenced in Policy Integrity's brief, in that they just reduce the overall amount of compliance. So it operates in the exact same way. Turning back to the arbitrary and capricious argument, it violates ordinary language as well as basic principles of reasoned decision making to conclude that something has a negative economic impact without at least considering the countervailing positive impacts. Here the economic benefits of an updated penalty were enormous. The agency does not dispute that the updated penalty could have saved consumers more than 50 billion gallons of fuel over the next 15 years. Even at today's historically low gas prices, that means that the updated penalty could have resulted in more than $100 billion in fuel savings, or more than $6 billion per year, which far exceeds any economic costs cited by the agency in its rule. One would not ordinarily say that something which saves you six times as much as it costs has a negative economic impact. But NHTSA adopted that unreasonable interpretation and expressly ignored the enormous positive impacts here to instead reinstate an outdated penalty that effectively gives automakers a free pass to violate the law. That one-sided analysis was arbitrary and capricious and contravenes Congress's express purposes in the Inflation Adjustment Act and should be set aside by this court as unlawful. The agency tries to justify its ignoring of positive economic impacts by pointing to the other exception for social impacts, but it misunderstands the distinction between the two exceptions. They differ in terms of the types of impacts on which they focus, the first on economic impacts and the second on a broader category of social ones, but both exceptions call for the same type of comparative analysis. Congress expressly referred to the weighing of costs and benefits in the social costs exception because social costs and benefits are intangible and not easily quantified. So this sort of weighing doesn't come automatically and Congress wanted to make clear that that's what it wished for. But economic impacts, by contrast, are inherently quantified and it's almost impossible to think about them coherently without some sort of comparison. That is reflected in the phrase negative economic impact. NHTSA's interpretation that the agency could completely blind itself to the positive economic impacts is also unreasonable because it violates the background principle that agencies engaged in reasoned decision-making should consider both the costs and benefits of their decisions. And it also ignores the context of this provision, which is that it is an exception to the otherwise mandatory adjustment. This court has explained in Citizens Against Casino Gambling that exceptions are to be construed narrowly in light of the statutory purposes. But here, reading the exception to allow the agency to blind itself to one side of the ledger would make this exception applicable in virtually every adjustment under the statute. It would allow the exception to swallow the rule and that is entirely unreasonable. You have one more minute. Thanks, Your Honor. I mean, on that point, too, NHTSA's reading of the two exceptions would render the social cost exception entirely superfluous. They cannot identify any instance where the social cost would outweigh the social benefits in which there wouldn't be some negative economic impact under their misreading of that phrase. If there are no questions, Your Honors, I would reserve the remainder of my time for rebuttal. All right. Any questions for Mr. Kine? Thank you. All right. Thank you, Mr. Kine. We'll now hear from Mr. Phan on behalf of the NLE. Good morning. May it please the Court. Dennis Phan on behalf of the United States. Congress, through the Improvements Act, directed individual agencies to carefully examine the penalties within their statutes and the economic impact of adjusting those penalties for inflation. Congress made efforts to make sure that agencies got those important questions right. And NHTSA here went through a thorough process of consulting OMB and conducting notice and comment proceedings to consider afresh the CAFE penalty before it reached two independent conclusions that I'll address. First, that the standalone statutory scheme for CAFE penalties did not meet the definition of a civil monetary penalty. And second, even if it did, that a negative economic impact of billions of dollars counseled against the first inflation adjustment. I just wanted to start off on the first point with the statutory ambiguity. I think Judge Nardini is entirely correct that there are two potential readings of the statute. One is that the civil penalty or the penalty is a $5 figure and the other is that it is the entire phrase. The first is simply not the correct reading of the statute. And we know that for a couple of reasons. One, it's sort of odd to think of truncating a phrase arbitrarily at a certain point. And second, the very next sentence, the very next subsection, 32-912-C1A, says that the $5, the $5.50 figure is the quote amount to be used in calculating a civil penalty. It would be really odd for Congress to say that $5.50 is both the penalty and the amount used in the penalty. Congress just doesn't speak through both sides of the mouth in that way, and it's hard to infer that that word has two different meanings. I wanted to pick up about a few structural ways, too. Well, actually, this is Judge Nardini. Can I interrupt? It struck me that in 32-912, arguably Congress was talking out both sides of its mouth, perhaps because ECPA was written before the Inflation Improvement Act, so it had no reason to think about how it would have interplay with a future unenacted statute. But if you look further down to 32-912-C1C, after talking about how the Secretary of Transportation can increase the $5 amount, it then places restrictions on the Secretary making a decision only when the Secretary decides, quote, that it is likely that the increase in the penalty, end quote, will have certain consequences. And it's clear, right, that of the parts of Section D that the Secretary may increase, it is only the $5 multiplier, right? It can't – I'm correct that it cannot increase the factors listed in D-1, 2, or 3, right? So two answers to that. There are parts of the penalty that the Secretary can independently increase that are not the $5 figure. First, you know, the Secretary goes through rulemaking to consider the economic effects of the CAFE standard and the feasibility of the CAFE standard, and that is part of this penalty formula. In fact, the Secretary has done so recently. But all of that is part of how the CAFE penalty ultimately does increase. The second is that I don't think the phrase increase in the penalty necessarily means an increase in the $5 figure. And I say that for the main reason that, of course, when you increase the $5 figure, let's say you increase it to $10, the natural mathematical outcome is most likely the penalty is going to increase. Yeah, but it's not certain. I mean, if they lower the CAFE penalties, right, then the penalty might decrease, or even if they leave them static. But we all know – I would say NHTSA knows that the manufacturing industry has been increasing and is continuing to increase fuel efficiency. They may know that even increasing the $5 multiplier may yield a decreased penalty. I mean, it says the increase in the penalty. I mean, isn't that only really read – it says before the Secretary may make a decision under paragraph A-2. He can make this finding. And under A-2, the only thing it's doing is increasing the multiplier, right? They're not talking about altering the CAFE standards. No, there aren't. But, you know, part of the increase in the $5 figure is looking at the entirety of the – there are other formulations that they use for economic impact, like a substantial or deleterious impact on the economy. But there are other reasons why there might not be an increase in the ultimate penalty. I mean, you might have an instance where the Secretary believes that automakers are going to make fewer cars. You might have an instance where, you know, it hasn't happened before, but where the Secretary finds that an increase to the CAFE standard was, in fact, unwarranted. And, you know, that should come back down because it's no longer feasible or it never was feasible to begin with. And in all those instances, you might balance those against the increase in the $5 amount and say, well, there would be no increase in the penalty ultimately. But I do want to kind of think about this through a broader perspective, and I want to address a few of the points, too, about the credit scheme. It's not correct that the credits are just about compliance. If you have credits that make up the entirety of the shortfall, you don't have a violation under 32-911. But B-3, 32-912-B-3, isn't about whether there's a violation or not. It's about adjusting the penalty amount. And I just want to kind of give an example of that. Let's say a manufacturer has a shortfall from the CAFE standard based on the number of cars they manufactured. It's going to owe a million dollars before credits come into play. Now, let's assume that manufacturer has a million dollars worth of credit. That manufacturer can either choose to apply all those credits, in which case it comes into full compliance under 32-911. It could choose to use none of those credits, in which case it pays a million dollars. Or it can choose to use half of those credits, and it will pay something in the middle. All of those are reasons why the actual penalty amount is not for a specific monetary amount. And manufacturers make those choices within this scheme based on their economic realities. Some years, they might be losing a lot of money, and so they might want to use their credits right away. Judge Park, can I ask you, what do you do with the history here? I mean, everyone, it seems, including NHTSA, OMB, had thought that the penalty was subject to the Improvements Act. And this is clearly a change of position. Is your argument that we just ignore that because this is a better interpretation? Yeah, I mean, it's fundamentally a good thing when agencies realize that they've gotten something wrong, even if it's something that they've gotten wrong for a long period of time. And our argument certainly is that this, first of all, just is a better interpretation. And the second point I'll mention, and of course, as long as the agency recognizes that it's changing position, which NHTSA here did in the United States. The second point I'll make is, I mean, what we have here is now a statute in which Congress wanted agencies like NHTSA, wanted OMB to take a careful, hard look at the penalties within their statutes. And so it wanted agencies to look at that question afresh because it realized that it was a really significant, important question to get right in the first instance. And you have the combined judgment of the executive branch between OMB and NHTSA to do this. The third is the only time in which NHTSA has actually made a determination is in the 1997 adjustment. And in that adjustment, NHTSA said that it was limited to adoption of the statutory language without interpretation. There's no sense that Congress wanted it to be that automatic. And I don't think that a regulation where an agency says that it's doing no interpretation has that much weight in the sort of long history that we're talking about. So I think all those are reasons why the history doesn't really matter as much here. And especially because the only time that there was pre-enactment history, which is the real type of if you're looking at legislative history, that's the only time that you would think that this sort of legislative history works out. But presidential counsel that looked at these penalties didn't identify any of these particular NHTSA penalties. And I also do want to point this out, and it's just not correct that NHTSA agreed that the increase from $5 to $5.50 is correct, as opposing counsel noted. If you look on page seven of the special appendix, footnote 45, NHTSA reserved sort of the possibility of reverting from $5.50 to $5.00. But that would have to be a different rulemaking for a different day. Can I ask about that? If NHTSA takes the position, which I think it is, that it's unlawful to increase – to apply the Inflation Improvement Act, why did it not seek to revert to $5.00 to sort of revert to what you view as a state of legality? There's a few reasons why NHTSA might not have – I mean, first, the Improvement Act gives you authority at this moment to look at the current inflation adjustment from the CAFE penalty on the books. And so that was the narrow question that NHTSA was focused on at this time. Second, and this has kind of gone through this process, it's noted at multiple junctures that there are various differing types of reliance interests, and it's always kind of reasonably addressed those reliance interests. But the particular interest in the $5.00 to $5.50 amount might be different. I have another question. It's Judge Nardini. Could you address what, if any, forms of deference you think are applicable? You seem to be arguing, I take it, that the statute's ambiguous, and in your brief you, I think, suggest Chevron deference for NHTSA and Skidmore deference for OMB. Is that correct? Yeah, I think that's pretty much correct. I will say – Correct me if I don't have it quite right, what your argument is. Yeah, so the Improvements Act no doubt gives NHTSA a very strong role to play in all this. And NHTSA's determination was based on its interpretation of the CAFE penalty statute. And the Improvements Act tells individual agencies like NHTSA that it's their role to apply their expertise, to look at their statutory schemes, and bring together their statutory schemes with the Improvements Act. We're not looking at an instance where NHTSA is looking at the Improvements Act in a vacuum, or where NHTSA is looking at the Improvements Act as it applies to other federal agencies, and we're not asking for Chevron deference or just OMBs looking at the Improvements Act in a vacuum. I mean what we're looking at here is an agency determination that Congress has specifically told the agency to go out to do by marshaling its expertise and its judgment about its own statutory schemes, and it's interpreted in ambiguity in that statutory scheme. So when there's an express delegation there – This is Judge Sullivan. Can I interrupt? I mean one thing you haven't focused on too much is that this horse is sort of out of the barn though, isn't it? I mean the statute says that you have to do all this by July of 2016 so that it takes effect by August of 2016, and that's in fact what the agency did. Now this is really an attempt to undo it, right? So I – And a few answers to that. I think the simplest answer is that we cite to this on page 38 of our brief that the Supreme Court has a number of deadline cases where sort of a deadline doesn't deprive the agency of its fundamental authority, and there's no sense that Congress would have wanted NHTSA to rush this to not get it correct. They did it by December, right? So they were a few months late. You're talking about now just undoing what the agency did. And there's plenty of reasons why NHTSA can go back and look at why something is correct. The second main point I have is – There's plenty of reasons, but the statute says that you shall do this by certain dates, and the agency complied with those dates more or less. So why isn't that the end of it? So let me kind of talk more specifically about what the agency had to do and by sort of what dates. The agency had to issue an interim final rule by a certain date. The statute doesn't set forth if there's a rulemaking that follows in which comments or petitions for reconsideration follow, if there's an end date or an end period for the final rule, let alone whether there's one, and I'm happy to address the sort of negative economic impact, let alone if there's one for the negative economic impact. The statute also says that that interim final rule has to take immediate effect. Now, you know, based on this court's prior decision, that interim final rule did take immediate effect. But there's no – nothing in the statute precludes or gives any sort of particular timeline for what happens afterward or gives a set period. In fact, we're still on the first adjustment. This isn't like the type of situation in which case the considerations might be different, where say NHTSA has adjusted the model year 2020 and the model year 2021 CAFE penalty, and then, you know, four years down the road, it looks back and says, whoops, we might have gotten this wrong in the beginning. I think that's the sort of horses out of the barn scenario, because what happened here was NHTSA issued the interim final rule. The final rule took effect – or the final rule took effect pretty much immediately, but a final rule was issued in December 2016. And a month later, in January 2017, NHTSA started the process by starting to take steps to, you know, push back the final rule to start to reconsider. This court said that that final rule had to be effective in the interim, but there's nothing in the statutory language that deprives an agency of the fundamental obligation to get its interpretations of the statute correct. And that would be a really odd scenario where an agency was forever locked in because it got something wrong in the first instance. How about the negative economic impact exception? How long is that available, in your view? There isn't really a set date, and again, we're still on the first adjustment. So, as long as NHTSA is doing this with respect to the first adjustment, which it is, the negative economic impact exception applies. The problem is that negative economic impact exception doesn't apply to future adjustments. So, if there were a second or third or subsequent adjustment or future years in which there might be an adjustment, the negative economic impact exception doesn't apply to those adjustments. But all of this just kind of underscores that Congress wanted the agency to get these issues right in the first instance, and that Congress didn't anticipate that agencies were just going to rush this through. And, in fact, the timeframe of how collapsed the timeframe for doing these inflation adjustments was suggests very strongly that Congress didn't envision that once you were done with those first couple months after the Improvements Act, agencies were forever precluded from using their authorities under the statute. I'm sure I'm well over time. I felt like I heard somebody interrupt me, but I do want to just say one last thing about the negative economic impact exception and why the agency's determination was reasonable here. You know, OMB concurred, and they said that they weren't unaware of any type of penalty that had the same type of – the same amount of effect or the same magnitude, and that this inflation adjustment far exceeds the revenue of all adjusted penalties. That makes it significantly different than, you know, other sorts of penalty schemes where we can be debating about whether there's really a negative economic impact here. And if you look at page 27 of the Special Appendix, you can just see there's two tables there. These are hundreds of millions of dollars, billions of dollars over the years that NHTSA is considering and calculating out, and that's really the basis of NHTSA's negative economic impact exception. If there are no further questions, we would ask that this court deny the petitions for review. All right. Well, thank you, Mr. Phan. We will now hear a rebuttal from Mr. Wu for a minute. Thank you, Your Honors. I want to make a couple of quick points. One is that, as Judge Sullivan pointed out, this is indeed a rollback and a reversal from a final penalty that NHTSA adopted in December of 2016. It's a penalty that was never challenged in court or the subject of further administrative proceedings before the agency. And the startling thing about NHTSA's position now about its continued authority to revisit that final determination is that it would give unlimited time, really, for any agency to reconsider negative economic impact. And far from conferring that authority on agencies, Congress had the opposite judgment, as this court recognized it wanted the much-belated inflation adjustments to occur on a quick timeline to ensure that civil penalties retain their deterrent effect. So, is your view, then, that—sorry, this is Judge Park—is your view, then, that an agency can't reconsider a rule once a deadline is passed? This is not a general proposition. Under this statute, because of how prescriptive it was, the agency cannot undo an initial catch-up adjustment that was finalized by that statute's deadline. That's the argument we are making. This is not a general proposition about an agency's power under the APA generally or under organic statutes. This is Judge Nardini. Can I ask you, are you making that argument across the board that under no circumstances was NHTSA allowed to reconsider this catch-up adjustment, or is that true also if, assuming we were to accept their argument that the Improvements Act does not apply to APA? Would you similarly take the position that even if we concluded that the Improvements Act did not apply to APA, too late, the rule is in place? The applicability of the Improvements Act is a prior sort of a predicate to our argument here about the ineffectibility to modify the penalty. And if I can address that as my sort of final set of points, as Judge Nardini pointed out, APCA itself, which was enacted before the Improvements Act here, does use language that refers to the amount, the $5 amount, as the applicable penalty. In Subsection C, the Secretary's power to increase the penalty amount, and the same word amount is used in the Improvements Act, refers to the $5. And as I think NHTSA has acknowledged, when it has applied previous inflation adjustments to the CAFE penalty, it has applied it to the $5 as well. And that's consistent with Congress's purpose here. And this is the point that maybe I will end with. Regardless of whether the penalty is determined by that amount or by the multiplied figure, the problem here is that the use of the dollar figure means that the penalty, either as an increment or as an ultimate amount, diminishes over time because of inflation. That's just a mathematical and economic reality. And what Congress wanted to do with the Improvements Act was to identify the penalty that had that particular feature and to remove that eroding effect by updating them for the cost of living. That was a straightforward mathematical operation that has occurred across hundreds of penalties that resemble the type of formula that's used here. And NHTSA was not exempt from this broad mandate from Congress. Thank you. Actually, can I just jump in one more question? I'm sorry if I'm... No, that's fine. Go ahead, Judge McGee. If we were to find that this statute is ambiguous, I'm trying to figure out what each party thinks is sort of the tiebreaker in their favor in terms of our canons of statutory construction. And it's not entirely clear to me, but it sounds like NHTSA is asking for some sort of Chevron-y, Skidmore-y difference. It's not entirely clear what form or maybe combining NHTSA and OMB's views. It's my understanding that the appellant's view is that neither Chevron nor Skidmore applies. So in your view, what is the canon of statutory construction that helps us resolve the ambiguity? Is it looking only at the purpose of the statute, or what is it? What is, in your view, is the tiebreaker? So a couple of responses. One is we do not think any deference applies to either NHTSA or OMB here. And that's because the relevant statute here is the Improvement Act. And for purposes of the Improvement Act, there is no relevant ambiguity that affects what Congress intended to do with that statute. And the tiebreaker for us is a couple of things. One, it is Congress's choice of specific monetary amount to refer to dollar figures that are eroded by inflation. It's the extremely long history here of the applicability of this very definition to the CAFE penalty and to hundreds of other similar penalties. And it's NHTSA's own compliance with that running all the way up to 2016 and early 2017 until its most recent change. We think all of those, and those are sort of background… It's kind of like a reverse Chevron. It's like Chevron until a year or two ago. Well, we do not think that the prior positions of NHTSA and all of these other government agencies is something that we're saying is entitled to deference. So, to say that there was a penalty against an understanding where there was literally no dissent from the position that the CAFE penalty was covered is a meaningful indication of Congress's intent. And particularly so when throughout this entire period, the CAFE penalty has been, if not the most significant, then at least one of the largest civil penalties collected by the federal government. It is inconceivable that Congress would have wanted to disregard that penalty when agencies across the board have been covering it under prior inflation adjustments. And just so I have the chronology right, am I correct that the latest Improvements Act was enacted after NHTSA applied the previous Inflation Act to increase the penalty from 5 to 550? That's correct. That $0.50 or 10% increase occurred in 1997, and the 2015 Improvements Act that issued here, which has all the deadlines in it, was in 2015. So I would take it one of your arguments is Congress would have been legislating against a backdrop of NHTSA having interpreted and applied the language in the way that you are suggesting is correct. That's correct. And just to emphasize this point, the relevant definition of civil monetary penalties has been in place since 1990 with the original Inflation Adjustment Act. And although that original act did not require inflation adjustments in the same way, it required a report about penalties covered by the statute, and it required a calculation, an unenforceable calculation, a calculation under that statute. And OMB and NHTSA applied the 1990 Act as well to the CAFE penalty in the report that they issued under the statute. All right. Thank you, Mr. Wu. Mr. Fine, you have a minute of rebuttal. Thanks, Your Honor. Just picking up on that last piece, too, about the history, I think it's really important to emphasize this is not congressional inaction we're talking about over this consistent interpretation. But rather, as Mr. Wu was pointing out, Congress amended the act twice after being specifically informed on multiple occasions that the act applied to this penalty, and after NHTSA itself applied the act to this penalty. And during those amendments, Congress exempted some penalties from the act's reach, but it did not exempt the CAFE penalty. In terms of the agency's inability to go back and revisit what it did here, too, Your Honor, it's important to emphasize that the agency finalized its catch-up adjustment in December 2016. Under the statute, anything beyond that point would have been, by necessity, a subsequent adjustment. But the act provides agencies no discretion under those subsequent adjustments. They're mandatory and are to be adjusted for inflation. If there are no further questions, Your Honor, we respectfully request that the Court grant our petitions for review and vacate this unlawful rule. All right. Thank you all. Well argued. Interesting case. We will reserve the floor.